```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    |
DORCHESTER FINANCIAL SECURITIES,    |
                                    |
              Plaintiff,            |
                                    |
    -against-                       |
                                    |
BANCO BRJ, S.A. and THE SOCIETY     |
for WORLDWIDE INTERBANK FINANCIAL   |
TELECOMMUNICATION (S.W.I.F.T.),     |
                                    |
              Defendants.           |
                                    |
                                    |
DORCHESTER FINANCIAL SECURITIES,    |
                                    |   02 Civ. 7504 (KMW) (KNF)
              Judgment Creditor,    |
                                    |        OPINION AND ORDER
    -against-                       |
                                    |
BANCO BRJ, S.A.,                    |
                                    |
              Judgment Debtor.      |
                                    |
DORCHESTER FINANCIAL SECURITIES,    |
                                    |
              Petitioner,           |
                                    |
    -against-                       |
                                    |
BANCO BILBAO VISCAYA                |
                                    |
              Respondent.           |
                                    |
------------------------------------X
```

Wood, U.S.D.J.:

Petitioner Dorchester Financial Securities ("Dorchester") seeks a turnover order, pursuant to Federal Rule of Civil Procedure 69(a) and New York Civil Practice Law and Rules §

1

5225(b), directing Respondent, sued herein as Banco Bilbao Viscaya ("Banco Vizcaya"),[1] to pay Dorchester the cash value of two cashier's checks, which were allegedly issued by Banco Vizcaya, in partial satisfaction of a default judgment Dorchester obtained against Banco B.R.J., S.A. ("BRJ"), the alleged true owner of the checks.

As set forth below, the evidence before the Court is overwhelming that the cashier's checks at issue are counterfeit, and therefore, unenforceable.  Accordingly, the Court DENIES Dorchester's petition with prejudice.  (D.E. 29.)

**BACKGROUND**

I.   Dorchester's Alleged Role in Locating the Cashier's Checks

On November 25, 2003, the Court entered a default judgment against BRJ in favor of Dorchester in the amount of $112,279,252.05.  (See Order, 11/25/03, D.E. 24.)

Dorchester alleges that, in the course of an investigation to locate BRJ assets for collection, it located two cashier's checks totaling approximately $108,511,169.42 U.S. dollars.

---

[1] Petitioner, in naming "Banco Bilbao Viscaya" as Respondent, appears to seek to name the bank it alleges issued the checks.  That entity, formerly known as Banco Bilbao Vizcaya-Mexico, S.A., is now known as BBVA Bancomer, S.A.  (Martell Decl. ¶¶ 2-4.)  Unless greater precision is necessary, the Court refers to Respondent generally as Banco Vizcaya.

2

Dorchester alleges that BRJ purchased these checks from Banco Vizcaya in 2000 and 2001, and that BRJ had these checks made payable to a "fake payee," called the "Tesoreira de la Federacion." (Pet. Mem. at 5.)  Dorchester then alleges that an unnamed official at BRJ instructed a purported business associate, Mr. Victor Manuel Aguirre Garcia, to take delivery of the two checks as an "agent of BRJ" and to hold them for the purpose of hiding the funds from creditors.  (Id. at 5-6.)

On or about February 25, 2009, some eight years later, Dorchester's counsel, T.J. Morrow, allegedly convinced Mr. Garcia to deliver the cashier's checks to Dorchester for collection against the BRJ judgment.  Mr. Garcia apparently agreed to deliver the checks in exchange for a fifty percent share of the proceeds.  (Garcia Aff. ¶¶ 21, 23; Sanchez Decl. ¶9.)

Then, Mr. Morrow, along with Mr. Garcia and a third person, allegedly formed what Petitioner describes as a "common law trust" in the name of the fake payee on the checks to "test" whether funds were currently available for collection.  Mr. Morrow then endorsed one of the checks (check numbered 730) in the name of the trust and presented the check to J.P. Morgan Chase for payment.  On April 21, 2009, Dorchester was informed by J.P. Morgan Chase that Banco Vizcaya, the purported issuing bank,

3

had stopped payment on the check.[2]  (Pet. Mem. at 6).

On April 28, 2009, Dorchester commenced the instant special proceeding, seeking a turnover order against Banco Vizcaya for the cash value of the two cashier's checks.[3]

II. <u>Banco Vizcaya's Investigation into the Checks</u>

The checks at issue, which were purportedly issued by Banco Bilbao Vizcaya-Mexico, S.A. ("BBVA-Mexico"), had been the subject of a previous internal investigation at BBVA Bancomer, S.A. ("BBVA Bancomer"), as BBVA-Mexico is now known.[4]

Banco Vizcaya asserts that, during March and April 2008 (almost a year prior to the alleged acquisition of the checks by

---

[2] The Court notes that Dorchester's counsel, Mr. Morrow, is also identified in certain of Dorchester's corporate filings as an officer and director of the company (see Uchima Decl. ¶ 3; Ex. B) - a fact not mentioned in Mr. Morrow's Affidavit or in any of Dorchester's submissions.

[3] On August 8, 2009, the Court ordered Dorchester to serve Banco Vizcaya and BRJ for a second time, because at that point neither had responded to Dorchester's petition.  The Court also directed Dorchester to submit an affidavit confirming its compliance with the Court's Order.  On October 9, 2009, Mr. Morrow informed the Court that, due to a "law office failure," he never received a copy of that Order.  On October 26, 2009, Dorchester submitted an affidavit detailing its compliance, and on November 23, 2009, Banco Vizcaya timely responded to Dorchester's petition.  BRJ, the judgment debtor, has not submitted a response to date.

[4] The Audit Report of that investigation, dated November 28, 2008, is attached to the Declaration of Rafeal Pimentel Escobar, ("Escobar Decl.") as Exhibit 1.  A certified English translation of the Audit Report is attached as Exhibit 1A.

Dorchester) two individuals, on two separate occasions, presented to BBVA Bancomer for payment photocopies of the cashier's checks at issue in this case: (1) check No. 730, dated November 16, 2000, in the amount of $690,039,000 Mexican pesos, and (2) check No. 831, dated January 18, 2001, in the amount of $757,500,000 Mexican pesos.  (See Escobar Decl. ¶¶ 2-4.)

In response to those incidents, BBVA Bancomer initiated an investigation into the two checks.  According to Banco Viscaya, this investigation revealed numerous irregularities with respect to the checks, which led to the conclusion that the checks were counterfeit. (Escobar Decl. ¶ 3-4; Ex. 1A.)  For example:

- The magnetic identifying strip on the two checks correspond to an account assigned to the "Niza C.R. 0018" branch, which is different than the branch name and address printed on the checks;

- The actual checks Nos. 730 and 831 issued by the Niza C.R. 0018 branch differ from the checks presented for payment in 2008: actual check No. 730 was issued on April 24, 1998, in the amount of $110,000 (Mexican pesos), to a different payee, and was deposited three days after issuance; and actual check No. 831 was issued on August 12, 1998, in the amount of $17,000 (Mexican pesos), to a different payee, and was paid in

    cash the day after issuance.

- A comparison of the checks presented for payment in 2008 with copies of the original checks, revealed numerous differences in features and printing characteristics such as (1) the appropriate "security level symbol"; (2) the absence of a "legend of the place of issuance"; (3) incorrect placement of the "$" sign in the spaces for the amount in letters and numbers; and (4) the existence of lines (where none should be) underneath (a) the payee's name, (b) the amount in words, and (c) the signature.

(Escobar Decl. Ex. 1A; App. A-D.)

  Finally, in its memorandum, Banco Vizcaya notes that, by the dates the checks were purportedly issued on the account of BBV Mexico - November 26, 2000 and January 18, 2001 - that entity had already changed its name to BBVA Bancomer. (Martell Decl. ¶3.)

**STANDARD OF REVIEW**

  Under Federal Rule of Civil Procedure 69(a), the procedure to enforce a money judgment in federal court is governed by the procedure of the state where the court is located; in this case, New York's Civil Practice Law and Rules ("CPLR").

  CPLR § 5225(b) authorizes a judgment creditor to commence a

"special proceeding" against a third party to compel the turnover of assets belonging to a judgment debtor. Koehler v. Bank of Bermuda, Ltd., 12 N.Y.3d 533, 537 (2009).

As explained by the Second Circuit, the statute provides a two-step analysis to determine whether such property (currently in the possession of a third party) should be turned over to a judgment creditor. Beauvais v. Allegiance Securities, Inc., 942 F.2d 838, 840-41 (2d Cir. 1991). First, it must be shown that "the judgment debtor 'has an interest' in the property." Id. (quoting CPLR § 5225(b)). Second, it must be shown that the "'judgment debtor is entitled to the possession of such property,' or . . . that 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is." Id. (quoting CPLR § 5225(b)); accord United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 988 F. Supp. 367, 374 (S.D.N.Y. 1997).

In a special proceeding under the CPLR, a court is authorized to make a "summary determination" on the basis of the parties' submissions where "no triable issues of fact are raised." CPLR § 409(b). Disputed issues of material fact, however, require a hearing or trial. Id.; see CPLR § 5239; General Motors Acceptance Corp. v. Norstar Bank of Hudson Valley, 156 A.D.2d 876, 877 (3d Dept. 1989); see also Trusto Bank, Nat'l

Assoc'n v. Strong, 231 A.D.2d 25, 27-28 (3d Dept. 1999) (courts will "apply summary judgment analysis [to petition in a special proceeding,] and absent a factual issue requiring a trial[,] will summarily dismiss the petition") (internal citations omitted).

**DISCUSSION**

Dorchester argues that it is entitled to a turnover order because BRJ, the judgment debtor, is the true owner of the cashier's checks issued by Banco Vizcaya.  Banco Vizcaya opposes the petition, arguing that (1) Dorchester has served the wrong party in this proceeding, and (2) in any case, the checks at issue are counterfeit, and therefore, unenforceable.

As set forth below, Banco Vizcaya has submitted overwhelming evidence that the cashier's checks are counterfeit. Dorchester's response is limited to conclusory and/or speculative allegations that are insufficient to raise a genuine issue of material fact with respect to the checks' authenticity.  Accordingly, the Court concludes that the checks are unenforceable against Banco Vizcaya, and that BRJ has no interest in the funds at issue.  The Court, therefore, denies Dorchester's petition with prejudice.

I.   Service of Process

First, it appears Dorchester has served the wrong party. Dorchester served its motion at 1345 Avenue of the Americas, New

York, NY, 10015, which is a branch of Banco Bilbao Vizcaya Argentaria ("BBVA").  BBVA is the parent company of the bank that purportedly issued the checks, BBVA-Mexico, a separate legal entity now known as BBVA-Bancomer.

The Court, however, will not consider the potential jurisdictional issue in this petition, see, e.g. Giar v. Centea, No. 02 Civ. 7916 (LLS), 2003 WL 1900836, at *2 (S.D.N.Y. Apr. 16, 2003) (service on a parent corporation does not constitute service or confer jurisdiction on a subsidiary, where subsidiary is a separate legal entity and not the mere department or alter ego of the parent), because the evidence is sufficient to deny the petition on an independent ground; namely, that the judgment debtor has no ownership interest in the cash value of the cashier's checks, because the checks themselves are counterfeit.

II.  The Cashier's Checks

The general rule in the law of negotiable instruments is that a forged signature is "wholly inoperative" as that of the purported signer.[5]  Century Federal Savings and Loan Ass'n of Long Island v. Roudebush, 618 F.2d 969, 971 (2d Cir. 1980)

---

[5] There are certain exceptions to this general rule that arise in the context of the check collection system.  See UCC § 3-406(a); J. Walter Thompson, U.S.A., Inc. v. First BankAmericano, 518 F.3d 128, 131-34 (2d Cir. 2008).  These exceptions are not relevant here.

(citing N.Y. UCC §3-404). A counterfeit check is the equivalent of a forged check, i.e., a forgery of the signature of the purported drawer. BRADY ON BANK CHECKS: THE LAW OF BANK CHECKS ¶ 28.03 (rev. ed. 2009); see MBTA Employees Credit Union v. Employers Mutual Liability Insurance Co. of Wisconsin 374 F. Supp. 1299, 1302 (D. Mass. 1974). In the case of a bank's cashier's check, the purported drawer is the bank itself. Accordingly, a counterfeit cashier's check will generally be unenforceable as a liability of the purported issuing bank.

As set out above, the evidence is overwhelming that the checks are counterfeit, and Dorchester has failed to come forward with any evidence to cast doubt on that conclusion.[6] Instead, Dorchester's response is limited to (1) a conclusory assertion that the proofs will ultimately show the checks to be genuine;

---

[6] Dorchester also argues that it is entitled to a turnover order based on its alleged status as a holder in due course ("HDC") of the checks. Dorchester's argument fails for a number of reasons. First, Dorchester fails to explain how its alleged status as a HDC is relevant to the CPLR § 5225(b) inquiry, which asks what rights, if any, BRJ, as the judgment debtor, has in the cashier's checks. Second, in the law of negotiable instruments, a claim that a check is forged is a "real" defense that is good even against a HDC. Century Federal Savings, 618 F.2d at 971; see Chemical Bank of Rochester v. Haskell, 51 N.Y.2d 85, 91 (1980). Third, Dorchester's claim that it is a HDC is highly questionable. Notice that a check is overdue deprives a holder of the instrument of HDC status. See Chemical Bank, 51 N.Y.2d at 91. Under UCC 3-304(a)(2), a check is overdue 90 days after its date of issuance, and here the face of the checks indicate that they are more than eight years old.

(2) counsel's speculation that the checks <u>must</u> be genuine because the first check initially cleared the depository bank (despite the fact that only a few days later the purported issuing bank stopped payment on the check); and (3) the bare claim that the reliability of BBVA Bancomer's investigation should be doubted because the analysis of the checks was based on photocopies rather than "originals."  (<u>See</u> Pet Mem. 1, 5.)  The Court finds that these allegations are insufficient to create a genuine issue of fact as to the checks' authenticity.[7]  <u>See</u> <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. N.Y. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."); <u>Arnold Graphics Indus., Inc. v. Independent Agent Ctr., Inc.</u>, 775F.2d 28 (2d Cir. 1985) (no trial required where "presentation in opposition to the motion was insufficient to compel the conclusion that . . . disputations of fact were genuine").

Accordingly, the Court concludes that cashier's checks at issue are unenforceable against Banco Vizcaya, and consequently, that BRJ does not have "an interest" in funds at Banco Vizcaya

---

[7] The Court notes that the conclusion that the checks are counterfeit is not inconsistent with Mr. Garcia's affidavit.  In the affidavit, Mr. Garcia states only that he took delivery of the checks from someone claiming to be a Vizcaya banker, and that BRJ official instructed him to hold onto the checks he eventually turned over to Dorchester.  (Garcia Aff. ¶¶ 6-10.)

that can be the subject of a turnover order.  CPLR § 5225(b); see also In re Navigator Gas Transport PLC, 358 B.R. 80, 88-89 (Bkrtcy. S.D.N.Y. 2006) (creditor failed to make sufficient showing of "interest" where facts alleged suggest that the debtor had only considered purchasing the shares in question).

III. The Necessity of an Evidentiary Hearing

Dorchester argues that it is nonetheless entitled to an evidentiary hearing based on its claim that the checks are genuine.  The Court disagrees.

As explained above, summary judgment analysis applies to a petition in a special proceeding, HBE Leasing Corp. v. Frank, 48 F.3d 623, 633 (2d Cir. 1995), and a summary determination based on the parties' papers is appropriate where there are no genuine issues of material fact.  Id.  Dorchester's allegations are insufficient to raise a triable issue of fact on summary judgment, supra, and consequently, they do not require an evidentiary hearing in the instant turnover proceeding.

**CONCLUSION**

For the reasons stated above, the Court DENIES Dorchester's petition with prejudice.  (D.E. 29.)  Costs to Respondent as the prevailing party.  See Fed. R. Civ. P. 54(d)(1).  The case shall

13

remain closed.

    SO ORDERED.

Dated:    New York, New York
           December 23, 2009

                            Kimba M. Wood
                        United States District Judge

13